Steven I. Adler, Esq. (7573))
**MANDELBAUM BARRETT P.C.**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
T. (973) 736-4600
Email: sadler@mblawfirm.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHANIE MARINELLI<br><br>        Plaintiff,<br><br>v.<br><br>CITIBANK, N.A.,<br><br>        Defendant. | Civil Action No.:<br><br>        Civil Action<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Stephanie Marinelli, residing at 9 Deerhill Drive, Ho-Ho-Kus, New Jersey, by way of Complaint against Defendant Citibank, N.A., alleges and says:

### Introduction

1.     This is an action brought by Plaintiff Stephanie Marinelli (**"Plaintiff"** or **"Marinelli"**) against Defendant Citibank, N.A. (**"Defendant," "Citibank"** or the **"Bank"**) under 18 U.S.C. 1514A, the Sarbanes Oxley Act of 2002 (**"SOX"**) as a result of retaliation taken against her for engaging in protected activities complaining about the Bank knowingly and willfully concealing and/or falsifying financial records with the intent and for the purpose of obstructing, impeding and/or influencing a matter within the jurisdiction of a department or agency of the United States and, in particular, an investigation conducted by the Office of the

Comptroller of the Currency (the **"OCC"**), a bureau of the United States Department of the Treasury, that supervises all national banks and federal savings associations.

2.      Based upon her years of experience and training, Marinelli reasonably believed that the Bank's conduct was fraudulent, violated the law, involved deception and misrepresentation to a governmental agency and, therefore, objected verbally and in writing to persons with supervisory authority over her and to such persons working for the Bank who had authority to investigate, discover and/or terminate the misconduct.

3.      Marinelli's whistleblowing comes virtually on the heels of the OCC imposing a $400 million money penalty against Citibank and while Citibank was supposed to be complying with a consent order (the **"Consent Order"**) entered with the OCC at or about the same time.

4.      As a result of Marinelli's objections and whistleblowing, including but not limited to her refusal to assist or participate in the violations, the Bank harassed, threatened, retaliated and/or discriminated against Marinelli, effectively demoted and thereafter discharged her after decades of exemplary performance.

5.      The retaliation taken against Plaintiff was so egregious that she suffered severe emotional distress and mental anguish, requiring her to take a medical leave of absence from the Bank on or about August 2, 2021 and, to this day, she remains unable to work due to the psychological and resulting physical harm she suffered.

## Jurisdiction and Venue

6.      This is an action brought under SOX and, therefore, this Court has jurisdiction under 28 U.S.C. 1331.  This Court also has diversity jurisdiction under 28 U.S.C. 1332 as Plaintiff resides in New Jersey, Defendant has a principal place of business located at 399 Park Ave., New York, New York 10043, and Plaintiff has damages well in excess of $75,000.  Venue

4862-1679-8529, v. 1

is proper under 28 U.S.C. 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## Identification of the Parties

7.      Plaintiff, who at all relevant times has resided in New Jersey, is an employee covered under SOX.

8.      Plaintiff has been employed by Citibank for nearly twenty-eight (28) years and currently is a Senior Vice President and a Regulatory Relations Senior Manager for the Bank.  At all times, Plaintiff has telecommuted and performed her role for the Bank from her home in Bergen County New Jersey.

9.      Citibank, a publicly traded national bank, is an entity covered under Section 806 of SOX considering it has a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (**"SEA"**) and/or is required to file reports under Section 15(d) of the SEA.

## Background

10.     Marinelli has been out on a medical leave of absence from the Bank since on or about August 2, 2021 as a result of the retaliation she suffered due to her whistleblowing activities protected under, among other things, SOX.

11.     Beginning in June 2013, Marinelli, a Senior Compliance Officer, became the principal interface between the Bank and its regulators (the **"Regulators"**) in fair lending bank examinations.

12.     From 2013 to 2016, Marinelli worked in Corporate Fair Lending as a Senior Vice President and successfully performed her responsibilities, which included the coordination of related regulatory compliance examinations of the Bank conducted by the Regulators.

13.     In that role, Marinelli was responsible for end-to-end examination management, and also provided advice in the development of enterprise-wide fair lending standards, policies and procedures, and provided third party oversight and issue management.

14.     Plaintiff filed a SOX complaint with the Secretary of Labor on or about October 21, 2021, and the Secretary of Labor has not issued a final decision within 180 days of the filing of the Complaint and any such delay was not due to any bad faith by Plaintiff.

**Marinelli's Promotion to Senior Manager of Regulatory Relations**

15.     In 2016, seeking advancement opportunities within the Bank, Marinelli applied for and received a broader role, that of Regulatory Relations Senior Manager within the Global Consumer Business Operational Risk and Control (**"CBORC"**) area of the Bank.

16.     In 2018, CBORC management assigned Marinelli to be the Examination Coordinator for the annual Servicemembers Civil Relief Act (**"SCRA"**), 50 U.S.C. 3901 et seq., and Military Lending Act (**"MLA"**), 10 U.S.C. 987 et seq. examination (the **"Examination"**) conducted by the OCC.

17.     The purpose of the OCC Examination is to determine compliance with the SCRA and MLA, and to also assess the Bank's adherence to its related policies, procedures, oversight, governance and reporting.

18.     In that regard, Marinelli was tasked with coordinating the Bank's responses to "Matters Requiring Attention" (**"MRA"**) that were previously identified because of the OCC's Examination and responding to any alleged violations of those laws.

19.     The SCRA, formerly known as the Soldiers' and Sailors' Civil Relief Act, is a federal law that provides protections for military members as they enter active duty and covers

issues such as installment contracts, credit card interest rates, mortgage interest rates and foreclosures.

20.     The MLA is a federal law that provides special protections for active-duty servicemembers and their dependents with regard to consumer-credit products including, but not limited to, certain student loans, by capping interest rates on many loan products, no mandatory waiver of certain rights and no prepayment penalties.

21.     CBORC management supported the responses to this annual regulatory Examination and, in 2019 and 2020, continued to assign Marinelli as the Examination Coordinator.

**The OCC Assesses a $400 Million Penalty Against Citi**

22.     Based upon the Bank's unsafe and unsound banking practices for its long-standing failure to establish effective, enterprise-wide risk management, compliance risk management and data governance programs and internal controls, on or about October 7, 2020, the OCC assessed a $400 million penalty against the Bank.

23.     The OCC also issued a cease-and-desist Consent Order requiring the Bank to take broad and comprehensive corrective actions to improve risk management, data governance and internal controls.

24.     The Consent Order also required the Bank to seek the OCC's non-objection before making significant new acquisitions and reserved the OCC's authority to implement additional business restrictions or require changes in senior management and the Bank's Board should Citi not make timely, sufficient progress to comply with the Consent Order.

25.     The Federal Reserve Board also took separate, but related, action against Citigroup, the Bank's holding company.

4862-1679-8529, v. 1

**The 2021 OCC Examination**

26.     In or about May 2021, at the request of John Christiansen (**"Christiansen"**), Marinelli's immediate supervisor, it was decided by the Bank's executive management that Independent Compliance Risk Management (**"ICRM"**) would coordinate the responses to the annual Examination for 2021 and beyond.

27.     Christiansen spoke with Ramona Lily (**"Lily"**) and Catrina Dacer (**"Dacer"**), who were the newly assigned Examination Coordinators for the 2021 Examination.

28.     Sometime in or about May 2021, Lily and Dacer were told by the accountable examination owner Ken Scott (**"Scott"**) to reach out to Marinelli for additional preparatory guidance related to the Examination and on or about May 21, 2021 they met with Marinelli in advance of an upcoming meeting with the OCC at which the Bank was to self-identify issues with regard to compliance with the SCRA and MLA.

29.     At the internal meeting on or about May 21st, Marinelli explained that the business should prepare a SCRA/MLA account inventory and, on or about May 25th, Marinelli discussed with Lily the prior year's data request from the OCC and provided other preparatory guidance.

30.     This information was also provided by Marinelli during a meeting she had with Christiansen, and ICRM stakeholders, Scott and Mark Garman.

31.     Thereafter, Christiansen sent Marinelli a text to her personal phone, telling her to pull back which was perplexing and concerning to Marinelli due to Christiansen's evident lack of support with regard to providing guidance to facilitate examination leadership transition.

32.     In an email, dated May 27, 2021, Marinelli documented the general guidance she had provided.

33.    On or about May 27, 2021, Examination Coordinators Lily and Dacer, along with the ICRM stakeholders, held their first Examination preparatory meeting with the OCC.

34.    During this meeting, the OCC explained what it was requesting for  testing

35.    Dacer planned a follow-up meeting with the OCC for June 3, 2021 and engaged Sean Heidmann, the Citi Cards and Military Response Unit's business coordinator, to begin data preparation.

36.    Lily and Dacer continued to host internal preparatory discussions, and invited Marinelli to attend the June 3, 2021 meeting with other Citi stakeholders and the OCC to advance Examination preparation discussions.

37.    At some point after this meeting, at the request of senior ICRM stakeholders, Marinelli was assigned to lead the Examination Coordination for the 2021 Examination as she had done in the three prior years.

**The Whistleblower Allegations**

38.    On or about June 11, 2021, Citi received the official request letter (the **"Request"**) for the 2021 Examination.

39.    Marinelli scheduled meetings with management and business coordinators to accelerate the data preparation efforts because this activity had not been completed before receiving the Request, as she had done for prior examinations.

40.    Thereafter, the OCC sent a June 17, 2021 email to specifically document its demands.

41.    On or about June 18, 2021, the Cards and Retail Bank coordinators who were to gather the information indicated that they needed more time to meet internal deadlines to compile and validate the data extract.

42.     On or about June 21, 2021, the coordinators communicated that there was an error with regard to responding to the data request and that certain data was not validating.

43.     Marinelli communicated this problem to Christiansen, adding that she had identified and engaged resources to provide missing information and included him on a related escalation.

44.     Marinelli soon discovered, however, that Christiansen did not want to escalate these developments to senior management.

45.     Therefore, beginning on or about June 22, 2021, Christiansen began to join the daily data working team sessions.

46.     During the June 22nd meeting and in front of 25+ meeting participants, Christiansen vehemently challenged Marinelli, often cutting her off-mid sentence, and talked pointedly to her about the OCC request and direction set for the team.

47.     Christiansen insisted that only certain information be provided even though Marinelli referenced the Request and clarification documented sent by the OCC.

48.     It was clear to Marinelli that Christiansen wanted to withhold and/or conceal evidence from the OCC for the purpose of obstructing or influencing the investigation and proper administration of the matter within the OCC's jurisdiction even though the Compliance Program Manager and the Bank's Legal Department determined that this information had to be supplied.

49.     To make matters worse, not only did Christiansen not wish to comply, he directed other Bank employees to do the same.

**The Bank Intentionally Misrepresents, Conceals, Obstructs, Influences
and Impedes the OCC's Examination**

50.     During the June 22nd meeting, Christiansen attempted to prevent the team from completing the data acquisition by the June 25th deadline set by the OCC.

51.     Christiansen also chastised Marinelli during subsequent team meetings on June 23 and 24, 2021.

52.     During said meetings, Christiansen told the data team working on the Examination to stop other work efforts that Marinelli had directed the team to accomplish.

53.     Moreover, Christiansen would not allow the team to discuss the data validation issues and refused to provide other information.

54.     On or about the morning of June 23, 2021, Christiansen, who was not a regular participant, showed up unannounced at the quarterly ongoing supervision meeting with the OCC that day during which the Bank was supposed to self-identify for the OCC known compliance issues.

55.     Christiansen was aware of the OCC's examination objectives, control and oversight deficiencies identified by the OCC, related violations and concerns with repeated violations and other issues identified by the Bank.

56.     On or about June 23, 2021, Christiansen refused to meet off-line with Marinelli to discuss what was transpiring and he was adamant to not align with her on next steps regarding compliance.

57.     On or about June 23, 2021 at approximately 6:50 p.m., Marinelli sent a summary email alerting stakeholders, such as the Managing Director of the Compliance Program, Legal, Student Loan Senior Management, Internal Audit, and other Examination coordinators, that she was requesting a discussion with the OCC on the following day given the time sensitivity of the tasks and the need to communicate that the Bank could not fully meet the June 25th data request deadline as some of the data was still being compiled and validated. Marinelli also provided the status on the data deliverable which she had confirmed with the business coordinators.

58.    Christiansen, who previously had not responded to Marinelli's requests to talk, promptly responded to this email, indicating that he disagreed with Marinelli and that he was going to meet with the OCC and "others," but not Marinelli, thereby preventing her from performing her role as the Examination Coordinator.

59.    Christiansen gaslighted and further retaliated against Marinelli by sending her other emails and instant messages, telling her that she caused confusion and made "us" look disorganized.

60.    In furtherance of his scheme to deceive and defraud the OCC, Christiansen advised Marinelli "you are not to send further communications regarding the exam internally or externally without my approval first."

61.    Christiansen later lied to Shawn Varnadore (**"Varnadore"**), Christiansen's supervisor, about time stamps of such messages, falsely claiming that Marinelli sent her OCC meeting request alert after his directive to Marinelli not to send any such communications without his expressed permission.

62.    As a result of Christiansen's instructions and retaliatory treatment of Marinelli, on or about June 24, 2021 at approximately 7:00 a.m., Marinelli complained to Varnadore regarding Christiansen's behavior.

63.    Marinelli told Varnadore, among other things, that she was both confused and concerned at how Christiansen treated her in recent meetings and how Christiansen was unavailable to meet with her on time sensitive matters.

64.    Marinelli was upset and embarrassed about Christiansen's conduct removing her from meeting with the OCC and that he had done so via an email sent to a broad distribution list of colleagues.

65.    Marinelli, therefore, asked for confidentiality, expressing fear of further retaliation.

66.    About an hour later, Varnadore met with Marinelli.

67.    Varnadore immediately told Marinelli that Christiansen provided her with his perspective which allegedly was "shared by others," but failed to identify anyone.

68.    Varnadore also interrupted Marinelli and, in a commanding tone, told Marinelli that she, Vernadore, had told Christiansen to step in.

69.    Finally, Varnadore told Marinelli that she would ask Christiansen to set up a time meet with Marinelli so they could discuss the situation further but, in the end, Varnadore failed to take any steps to investigate Marinelli's allegations of a hostile work environment created by Christiansen.

**Christiansen Fails to Provide the OCC with the
Requested Information and Misleads the Agency**

70.    At a meeting with the OCC on or about June 24, 2021 that Marinelli was not allowed to attend, Christiansen purposefully limited data that could reveal inconsistencies to the OCC.

71.    Moreover, to avoid discussing data validation challenges with a certain population, Christiansen misrepresented that it was more difficult for the Bank to identify them, which Marinelli knew was not the case.

72.    Christiansen also redirected the focus from necessary processing coordination and resolution to unnecessary changes to templates and performing extra work not requested by the OCC Regulators.

73.    No information was provided to the OCC that day.  Instead, Christiansen asked for more time and lied to the OCC about how much time the Bank previously had been given to

compile SCRA and MLA inventory as an excuse why more time was needed, failed to communicate data challenges and then did not ask for approval to not provide other information specifically requested by the OCC.

74.    In short, Christiansen provided false information and failed to disclose to the OCC that the Bank had no intention of providing certain information specifically requested by the OCC.

75.    By that time, however, both Marinelli and ICRM exam owner Scott were taken out-of-the-loop and excluded from discussions with CBORC management and the OCC.

76.    Later that day, at Varnadore's request, Christiansen met with Marinelli, confirmed that he changed direction for the data team and, when Marinelli asked why she was not included in the meeting with the OCC earlier that day, he responded, "because of what you might say."

77.    Marinelli explained to Christiansen why a change in direction would not address the specific request made by the OCC and that Citibank was intentionally failing to provide certain information specifically requested by the OCC.

78.    Despite knowing that the OCC required the information, Christiansen was adamant with Marinelli that the data team should not provide the OCC with the requested information.

79.    Marinelli maintained that it was a requirement to provide that information.

80.    Providing the information requested would have allowed the OCC to better analyze Citibank's compliance with SCRA and MRA benefits and that information also would have shown whether there was adherence to Bank policy and procedures which also was within the scope of the OCC's examination.

81.     Marinelli objected to Christiansen's approach as it was inconsistent with the demands in the Request, previous discussions with the OCC and what had been provided to the OCC in prior annual examinations.

82.     Christiansen's willful misconduct was detrimental to the Examination because, among other things, under Christiansen's direction, Citibank would not provide a comprehensive view of certain SCRA and/or MRA benefits and would not acknowledge that there were challenges in obtaining and/or validating the accuracy data by the due date provided.

83.     Ultimately, Christiansen knowingly obstructed, influenced and impeded the OCC by, inter alia, concealing, covering up and defrauding the OCC with his factual misrepresentations and succeeded in providing less information than that requested.

84.     Moreover, Christiansen never disclosed to the OCC that the data it requested had not been provided and that, what was provided resulted in a skewed and inaccurate view of the benefits related to a certain population.

85.     Moreover, to hide what was said on behalf of the Bank at that meeting, both Christiansen and Dacer ignored Marinelli's request for a copy of their June 24th OCC meeting summary.

86.     Christiansen's conduct grew even more aggressive and harassing toward Marinelli thereafter because Marinelli, in no uncertain terms, told various Bank employees, via email and during Zoom meetings, that Christiansen was not following the directions of the Regulators.

87.     In short, the Bank committed fraud and intentionally deceived the OCC in violation of the law.

**Christiansen's Retaliation Against Marinelli in Violation of SOX**

88.    Feeling extremely uncomfortable and concerned that Christiansen's and Varnadore's change in direction would cause a gap in the information provided to the OCC, without its knowledge, and would, therefore, hide inconsistent treatment and/or potential violations of the SCRA and MLA, on or about June 25, 2021 at approximately 8:25 a.m., Marinelli sent an email to Christiansen and other examination coordinators with whom Christiansen was working to the exclusion of Marinelli, complaining about Christiansen's behavior.

89.    In her communication, Marinelli confirmed that others had the same understanding as she concerning what was expected, which was in conflict with what Christiansen was doing.

90.    Chrstiansen responded with an email asking why Marinelli chose to document his conduct but later attempted to recall his email.

91.    Christiansen's fraudulent plan was intended to prevent the OCC Regulators from evaluating inconsistent treatment of servicemembers.

92.    Under OCC regulations, as well as the SCRA, banks are required to produce this information and it was shocking to Marinelli that Christiansen would act so recklessly especially considering the Consent Order the Bank was under and that it had been required to pay a $400 million penalty just the year before.

93.    In short, Marinelli was trying to protect Servicemembers' rights by providing the requested information while Christiansen was not.

94.     Christiansen's refusal to comply with the OCC's Request concealed information from the Regulators, hindered the Examination and made it impossible to determine whether there was consistent application of benefits in compliance with federal laws and regulations.

95.     Later in the day on June 25, 2021, during a data team meeting, Marinelli reminded the team of her instruction, in accordance with Citibank's privacy policies, not to upload any information containing servicemembers' Personal Identifiable Information (PII) without password protection.

96.     Christiansen immediately instructed the team to disregard Marinelli's direction, resulting in a team member receiving a data violation for posting unprotected PII information (e.g., account number and SSN) onto the team's SharePoint server.

97.     Toward the end of the day on June 25, 2021, and in retaliation or Marinelli's objections concerning the Examination, Christiansen instructed Marinelli to check off in the HR System that she authorized her 360 performance feedback from co-workers be sent directly to him and further requested that she add people with whom she did not regularly work to provide feedback concerning her performance, including people he knew were not supportive of her.

98.     Marinelli escalated her concerns about the manner in which the OCC Review was being handled and continued to assert her concerns over hostile and retaliatory treatment perpetuated by Christiansen and directed towards her.

99.     Varnadore responded by telling Marinelli that she was "disturbed by the continued reference to the words hostile and retaliatory" and asked Marinelli if she knew what those words meant. When Marinelli affirmed her understanding and began to communicate why she was using these terms, Varnadore stopped the discussion and directed Marinelli to HR.

100.    On July 1, 2021, and July 2, 2021, Marinelli met with HR conveying concerns about her well-being due to the hostile and retaliatory environment she was forced to work in.

101.    In or about early July 2021, after having received the data files in the format directed by Christiansen, the OCC complained about having received the data from the Bank in piecemeal fashion.

102.    On or about July 9, 2021, in the presence of the core Exam Management team, Christiansen demanded that Marinelli share an un-redacted file containing account and social security numbers of government employee Servicemembers, an act that would have resulted in a breach of contract between the Department of Defense (DOD) and Treasury and Trade Solutions (TTS), a department within the Institutional Clients Group division within Citigroup.

103.    The Agreement with the DOD restricted access to a select TTS employees on a need-to-know basis, deviations from which would require express exception approvals, a limitation that Christiansen was aware of and which Marinelli reminded him of again in this forum.

104.    When Marinelli responded that she would not violate the terms of the TTS and DOD Agreement by providing him with un-redacted information, Christiansen responded, "you and I will take this up with Varnadore in our meeting this afternoon!"

105.    That same day, Marinelli met with Christiansen and Varnadore and was told that her role as primary Examination coordinator was being given to Dacer, who had been the secondary Examination coordinator, and that Marinelli's role was now being limited to lead and drive the data to completion, (even though she already had support staff doing so).

106.    During this transition, on or about July 9, 2021 Dacer asked Marinelli to write a brief weekly executive status report, which she was happy to do.

107.     As Marinelli was completing this task for Dacer, suddenly Christiansen published the weekly execute summary, replacing Marinelli's name with his, yet another emotional intimidation tactic of Christiansen because, previously Marinelli sent these communications from her email and signed them jointly with Dacer and from the time Marinelli first led this Examination in 2018, these communications had always come from Marinelli.

108.     On or about July 22, 2021, Christiansen provided Marinelli with her mid-year performance review which further confirmed that he was manipulating facts to harass her and retaliate for her refusal to go along with how he was dealing with the OCC.  For example, Christiansen claimed that "*her gaps in OCC SCRA have become more evident and magnified thus far with the 2021 SCRA Exam. These skill concerns (Marinelli's) create risk from a regulatory perspective that requires rapid resolution.*"

109.     Christiansen's allegations in the mid-year review were in direct conflict with other parts of his own assessment as well as comments from business, legal, risk and project managers who assessed Marinelli's performance as part of the 360 review.

110.     On or about July 22, 2021, the OCC confirmed that the data provided at Christiansen's direction as inadequate.

111.     At or about that time, Marinelli stumbled upon the meeting summary from the June 24th OCC meeting and learned that Christiansen had provided the OCC with false information and omitted requested information and she reported same to the OCC.

112.     By email, dated July 26, 2021, Marinelli wrote to Varnadore stating, in pertinent part, that she (Marinelli) "was right all along regarding what information needed to be provided to the OCC.  I immediately raised the issue to John [Christiansen] when he caused confusion during a

data team meeting by redirecting work efforts to <u>not provide</u> the OCC this information which they had previously explained was necessary for their review."

113.    In that same email, Marinelli noted that Christiansen and Lily chose to disregard the OCC's instructions and incorrectly continued to redirect work efforts.

114.    Marinelli continued by indicating that she "believe[s] this constitutes a violation of the request made by the OCC, and is an intentional lack of regulatory cautiousness that place[d] Citi in a difficult position with the regulator…'

115.    In that same email, Marinelli noted that she had been removed from key related conversations, in a manner that totally lacked transparency.  Moreover, she wrote that "[w]hen I asked John [Christiansen] why I was not invited to meet with the OCC as I have been doing for the past four exams, he told me that he had concerns with what I would say in the discussion with the regulator.  This makes me feel very uncomfortable, as if he is hiding something…"

116.    Marinelli concluded in the e-mail that

> As I've …expressed to you and HR since last month, I have been harassed, humiliated, publicly shamed, unfairly managed by perceptions, and retaliated against after asserting my concerns regarding John's and Ramona's redirection.  I have been sick over this and am seeking professional help.  My physical, as well as my emotional health as been damaged by this negative experience.  Because of my commitment to Citi and my projects, I have tried to cope with what I claim to be a hostile work environment—fully created and maintained by John's conduct toward me.  However, I cannot tolerate it any further nor will I continue to permit myself from getting sick over the way John has been treating me.  Because of how I've been treated even after I appropriately escalated my concerns, in conjunction with ethical concerns of what I see as blatant and intentional disregard to the OCC's request…

117.    On or about August 2, 2021, after enduring ongoing harassment and retaliatory treatment impacting her emotional well-being, about which she repeatedly complained to management and HR, and believing that her concerns were not being investigated, Marinelli felt unsafe in her work environment and reached her breaking point.

118.    That day, Marinelli emailed Christiansen to advise him that she needed to sign-off to visit doctors. Christiansen responded coldly to Marinelli, who had never abruptly needed to leave work in this manner, simply to make sure she coded her time off in the system and to change her out-of-office notification to include that communications should go exclusively to him.

119.    Christiansen had accomplished his goal of removing Marinelli from the Examination tasks and from work.

120.    Thereafter, Marinelli remained deeply concerned that no actions were taken by the Bank to address Christiansen's retaliatory measures against her including a negative and false mid-year performance review and, on or about August 17, 2021, Marinelli requested that her response be noted in her personnel file. , Marinelli wrote a short response stating, in pertinent part, that

> It is important to note that my mid-year review comes one month after I escalated concerns to his manager and HR regarding the discriminatory hostile…retaliatory work environment which he has directed towards me, which continued to intensify after I escalated and raised concerns of how my manager was treating me, and that he redirected work not to provide the OCC with information that they requested during a bank examination, raising concerns that his actions were both unethical and in violation of the request…

121.    Thereafter, by email dated August 19, 2021, Marinelli wrote to Mary Christian, from the Bank's HR department, attaching her response to the mid-year review and asking to meet with her so that she could formalize her complaint and discuss the process for Marinelli to record her absence.

122.    In that email, Marinelli further states that she "strongly believe[s] that the management evaluation process failed me and resulted in what John acknowledges as a demotion in my responsibilities effective July 9, 2021.

123.    Marinelli concludes the email, stating

Lastly, it is important that you know that the OCC communicated that John's direction resulted in a gap in their expectations in an email, confirming my concerns all along and validates my attempts to protect the bank and…leads me to the logical conclusion this John's conduct and his attempts to preclude me from participating in this issue given my role in our department and in the exam.   His behavior has been unethical and contrary to Citi's expectations and our obligation to the OCC which is 'if you see something, you need to say something'.  Because of this, compounded by the ongoing hostile retaliatory work environment and discriminatory treatment of me as lead female exam coordinator who has unfairly been demoted, I have decided to formalize a complaint and would really appreciate your guidance on this process."

124.    At the present time, Marinelli still remains under the care of a doctor as a result of the harassing and retaliatory conduct of Christiansen and the lack of action from Varnadore and HR to promptly and effectively remediate and continues to remain out of work on a medical leave of absence.

## COUNT ONE

1.    Marinelli repeats and realleges all of the previous allegations as if same were fully set forth herein at length.

2.    Marinelli is an employee and the Bank is an employer covered by SOX.

3.    The Bank knowingly and willfully concealed and/or falsified information for the purpose of obstructing or influencing a federal investigation and about which Marinelli complained, both verbally and in writing, to supervisory authority over her and/or such persons working for the Bank who had authority to investigate, discover and/or terminate this alleged misconduct.

4.    Based upon Marinelli's years of experience, education and training, she reasonably believed that the Bank was engaging in said wrongful conduct and, therefore, blew the whistle on its violations.

5.      Marinelli engaged in protected activities under SOX and was retaliated against by Defendant because of such protected activities.

6.      As a direct and proximate result of said retaliatory and discriminatory conduct by the Bank, Marinelli has suffered, and continues to suffer, severe emotional distress and mental anguish including, but not limited to, physical injuries, as well as compensatory damages, attorneys' fees and costs of suit.

7.      The aforesaid conduct of Defendant was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

WHEREFORE, Marinelli demands judgment on this First Count of the Complaint against Citibank as follows:

A.      Damages;

B.      Punitive damages;

C.      Reinstatement with no loss of benefits or pay;

D.      Interest;

E.      Reasonable attorneys' fees;

F.      Costs of suit; and

G.      Such further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff Stephanie Marinelli hereby demands a trial by jury on all claims so triable.

MANDELBAUM BARRETT, P.C.
Attorneys for Plaintiff

By:/s/Steven I. Adler_____
        Steven I. Adler, Esq.

Dated: December 5, 2022